UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:07CV-00144-JHM


PHILLIP WAYNE YORK                                                    PETITIONER


VS.


ARVIL K. CHAPMAN, Warden                                             RESPONDENT


FINDINGS OF FACT, CONCLUSIONS OF LAW
AND RECOMMENDATION

BACKGROUND

Petitioner, Phillip Wayne York ("York"), proceeding *pro se* has filed a voluminous

petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, with numerous supporting exhibits

(DN 1, 16).  The district court referred this matter to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) (DN 8).

Respondent has filed a Rule 5 answer as well as a motion to dismiss or in the

alternative motion for summary judgment (DN 23, 24).  Additionally, respondent has submitted

numerous exhibits in support of his position (DN 29).  York has filed a memorandum in response

to the Rule 5 answer and dispositive motion (DN 33).

The undersigned concludes that the record is adequately developed to address the

issues raised herein and, thus, an evidentiary hearing is not necessary.  The issues being fully

developed, this matter is ripe for determination.

## FINDINGS OF FACT

York was convicted of manslaughter in the first degree and being a persistent felony offender in the second degree following a jury trial before the Russell Circuit Court (DN 29, Appendix at Page 55). His conviction arises from the death of Billy Bunch ("Bunch") on February 22, 1995 (DN 29, Appendix at Page 56). On November 17, 1997, the Russell Circuit Court sentenced York to twenty years imprisonment (DN 29, Appendix at Page 55).

Trial testimony showed that York walked about 250 yards to Bunch's mobile home in the early morning hours of February 19, 1995 (DN 29, Appendix at Page 33). York indicated to others that he intended to retrieve some property that he believed Bunch had stolen (DN 29, Appendix at Page 56). Jeremy Akers and Jonathan Hammond testified that at York's urging they accompanied him on the walk to Bunch's trailer (DN 29, Video Tape 1, 10/9/97 at 14:14:30 and 14:51:50). After they arrived at the trailer, York forced his way inside and attacked Bunch (DN 29, Appendix at Page 56). Eventually, the altercation spilled outside the trailer where Akers and Hammond watched York beat Bunch with his fists (DN 29, Appendix at Page 56). Eventually, Bunch fled to his parents' house next door (DN 29, Appendix at Page 56).

After York, Akers and Hammond returned to York's house, York bragged about beating Bunch and that he "whipped his ass" (DN 29, Tape 1, 10/9/97 at 14:52:42, 15:34:37 and Tape 2, 10/9/97 at 15:31:28). Additionally, York told Akers and Lori Morgan that if anyone asked, they should indicate that Bunch had fallen off the porch (DN 29, Video Tape 1 10/9/97 at 14:28:38 and Video Tape 2 10/9/97 at 15:41:04).

Hazel Bunch, Bunch's mother, testified that approximately 3:00 a.m. on February 19, she was awakened by a knock at the door (DN 29, Appendix at Page 56). When she answered the

door she found her son beaten and bloody (DN 29, Appendix at Page 56).  When Mrs. Bunch asked

who had done this, Bunch reported that it was York (DN 29, Appendix at Page 56).  Mrs. Bunch

testified that she called York and asked him why he had beaten up her son (DN 29, Appendix at 56).

According to Mrs. Bunch, York responded "I sent him halfway to hell, and I'm going to send him

on" (DN 29, Appendix at Page 56).

In the late morning of February 19th, Bunch was taken to a nearby hospital

emergency room (DN 29, Tape 4, 13:15:00 - 13:26:50 and Appendix at Page 56).  After being

treated and released, Bunch returned to his parents' house and stayed with them until Tuesday night,

when he returned to his trailer (DN 29, Appendix at Page 56).  The following morning, February 22,

Mrs. Bunch went to her son's trailer and found him dead in his bed (DN 29, Appendix at Page 56).

Kentucky State Police Detective Wheat testified that he was informed of Bunch's

death on February 22, 1995 (DN 29, Appendix at Page 56).  When Detective Wheat spoke with

Bunch's parents, they told him about the incident involving York and their son (DN 29, Appendix

at Pages 56-57).  Detective Wheat, accompanied by Sheriff Bennett, went to York's home to speak

with him (DN 29, Appendix at Page 57).  During their conversation, York told Detective Wheat that

Bunch had come to his house on Sunday or Monday night and had staggered off the porch (DN 29,

Appendix at Page 57).  Notably, York denied ever having been to Bunch's trailer (DN 29, Appendix

at Page 57).

On February 23, 2005, an autopsy was performed on Bunch's body (DN 28,

Appendix at Page 57).  The Assistant Chief Medical Examiner determined the cause of death was

an acute subdural hematoma, a blood clot in the brain (DN 29, Appendix at Page 57).  After being

informed of the autopsy results, Detective Wheat arrested York on February 23, 2005 (DN 29,

Appendix at Page 57).

The medical testimony at trial is of particular import to claims asserted by York.  For this reason, the undersigned will summarize the medical testimony at trial.

The emergency room physician, Dr. Tolentino, testified that in the late morning hours of February 19th he performed an examination, including a neurological evaluation, and ordered a chest, neck and skull x-rays (DN 29, Tape 4, 11:58:01).  Since his examination and the x-rays revealed no severe injuries, Bunch was released from the emergency room approximately two hours after his arrival (DN 29, Tape 4, 13:15:00-13:33:40).  Dr. Tolentino opined that an acute subdural hematoma will manifest symptoms within 24 hours of the injury (DN 29, Tape 4, 13:15:00-13:26:50).  Further, he opined if the attack in the early morning hours of February 19th had caused an "acute" subdural hematoma then Bunch probably would have exhibited some symptoms during his neurological evaluation 8 to 9 hours later (DN 29, Tape 4, 13:15:00-13:26:50 and 13:30:18-13:39:10).  Dr. Tolentino also opined that the injuries he observed and treated on February 19th probably were not the cause of Bunch's death (DN 29, Tape 4, 13:30:18-13:39:10).

The Assistant Chief Medical Examiner, Dr. Weakley-Jones, opined that blunt force trauma to Bunch's head produced the "acute" subdural hematoma that was the cause of death (DN 29, Tape 4, 14:00:53-14:13:40).  Based on a microscopic examination of brain tissue, performed on March 8, Dr. Weakley-Jones opined that the "acute" subdural hematoma was between 2 and 3 days old (DN 29, Tape 4, 14:13:40-14:14:52).  Notably, she testified that a subdural hematoma less than 5 days old is in her opinion "acute" (DN 29, Tape 4, 14:30:20-14:31:50).  However, she acknowledged some medical articles indicate a subdural hematoma must be less than 24 hours old to be considered "acute" (DN 29, Tape 4, 14:30:20-14:31:50).

Dr. Weakley-Jones opined the subdural hematoma was present when the emergency

4

room physician examined Bunch on the morning of February 19th but might not have been large enough to detect at that time (DN 29, Tape 4, 14:14:50-14:20:05). A CT scan, not a skull x-ray, would have revealed the subdural hematoma (DN 29, Tape 4, 14:15:50-14:20:05). Further, she disagreed with Dr. Tolentino's opinion about whether the subdural hematoma existed on February 19th because he could not see inside Bunch's skull (DN 29, Tape 4, 14:29:50). Dr. Weakley-Jones opined if the size of the subdural hematoma was relatively small on the morning of February 19th, a CT scan would have revealed its presence even though the neurological examination did not reveal its existence (DN 29, Tape 4, 14:35:40-14:39:40).

The defense case in chief included testimony from Dr. Roy Biggs, a radiologist (DN 29, Tape 5, 09:31:40-09:36:50). Dr. Biggs testified that he reviewed the x-rays of Bunch on the morning of February 19th and concluded they were all normal, including the x-ray of his skull (DN 29, Tape 5, 09:36:50-09:39:00). He pointed out that a subdural hematoma would have not shown up on an x-ray because an x-ray is used to detect broken bones (DN 29, Tape 5, 09:38:00-09:39:00). A CT scan is the appropriate tool for identifying soft tissue injuries such as a subdural hematoma, according to Dr. Biggs (DN 29, Tape 5, 09:38:00-09:39:00).

Dr. Biggs took exception with Dr. Weakley-Jones' use of the term "acute," he opined the term means a condition that develops within 24 hours of the triggering event (DN 29, Tape 5, 09:39:00-09:40:30, 09:41:30-09:46:21, 09:54:00-09:55:04). He explained that if the subdural hematoma occurred as a result of an injury on February 19th and Bunch died 3 days later then the condition was not "acute" (DN 29, Tape 5, 09:45:00-09:46:21, 09:54:00-09:55:04). In his opinion the medical examiner should have used a term other than "acute" to describe the subdural hematoma if it was more than 24 hours old (DN 29, Tape 5, 09:41:30-09:46:21, 09:54:00-09:55:04). Dr. Biggs conceded what the medical examiner saw under the microscope is determinative of the age of the

subdural hematoma (DN 29, Tape 5, 09:54:00-09:55:04).  He also opined if the emergency room doctor saw signs or indications of a subdural hematoma he probably would have ordered a CT scan (DN 29, Tape 5, 09:50:00-09:52:10).

On direct appeal to the Supreme Court of Kentucky, York presented three arguments (DN 29, Appendix at Pages 5-28).  Specifically, he argued: (1) The trial court erred in denying his motion for directed verdict because the evidence was insufficient to establish that his acts were the cause of Bunch's death; (2) the trial court erred in denying York's motion to suppress statements he made to Detective Wheat and Sheriff Bennett on February 22nd because they were made without the benefit of Miranda warnings; and (3) the trial court erred in not granting a mistrial following repeated unresponsive, highly inflammatory and prejudicial statements during cross-examination of prosecution witness Hazel Bunch, mother of the victim (DN 29, Appendix at Pages 13-27).  Notably, York's first and third arguments were presented as State law claims (DN 29, Appendix at Pages 13-19, 23-27).  Only his second argument presented a federal Constitutional claim to the Supreme Court of Kentucky (DN 29, Appendix at Pages 19-23).

The Supreme Court of Kentucky addressed the merits of each of these arguments (DN 29, Appendix at Pages 55-65).  Essentially, it concluded there was no merit to the arguments and affirmed the judgment of the Russell Circuit Court (DN 29, Appendix at Pages 55-65).  The Supreme Court of Kentucky rendered its opinion on September 3, 1998 (DN 29, Appendix at Page 55).

Meanwhile, in August of 1998, York filed a motion for new trial based on newly discovered evidence (DN 29, Appendix at Page 66-67).  The new evidence was deposition testimony Mrs. Bunch gave on September 25, 1996, in an unrelated civil action that York filed in the United States District Court for the Western District of Kentucky, Bowling Green Division (DN 29,

Appendix at Pages 447-453).[1]  Essentially, York argued that Mrs. Bunch's deposition testimony could have been used to impeach her testimony during the criminal trial that occurred over a year later (DN 29, Appendix at Page 66).  The Russell Circuit Court overruled York's motion because it concluded: (1) the alleged newly discovered evidence would not with reasonable certainty change the verdict upon retrial in light of the testimony presented at trial; (2) this was not new evidence because York was present during the assault and could have advised his counsel if someone else participated; and (3) York would or should have been privy to Mrs. Bunch's deposition testimony and he should have shared this information with his criminal defense counsel prior to the criminal trial (DN 29, Appendix at Pages 81-84).

In his brief to the Kentucky Court of Appeals, York argued that Mrs. Bunch's deposition testimony was newly discovered evidence that merited a new trial (DN 29, Appendix at Pages 93-98).  Additionally, citing the Brady[2] rule, York asserted the failure of the Commonwealth to disclose this as exculpatory evidence prior to trial violated his right to due process under the Fourteenth Amendment to the United States Constitution (DN 29, Appendix at Pages 94-95).

In an opinion rendered March 3, 2000, the Kentucky Court of Appeals affirmed the trial court's order denying York's motion for a new trial (DN 29, Appendix at Pages 125-141).  Before addressing the merits of York's contentions, the Kentucky Court of Appeals noted that York's failure to supply the trial court with an affidavit or other substantial evidence in support of the motion "in and of itself could be deemed fatally defective" (DN 29, Appendix at Page 139).  The

---

[1]York named as defendants in the civil action Tony King, Individually and as a Deputy Sheriff for the County of Russell, Commonwealth of Kentucky; Larry Bennett, Individually and as Sheriff for the County of Russell, Commonwealth of Kentucky; and Russell County, Kentucky (1:94CV-00159-JMD).

[2]Brady v. Maryland, 373 U.S. 83 (1963).

Kentucky Court of Appeals then commented "[d]espite this omission we will address the merits of York's contentions" (DN 29, Appendix at Page 139).

The Kentucky Court of Appeals concluded that York's newly discovered evidence was meritless (DN 29, Appendix at Page 139). In reaching this conclusion the appellate court noted that Mrs. Bunch's deposition was taken during a civil action filed by York and that York's attorney in the civil action, who actively participated in the deposition, could have and should have relayed this information to York or his criminal attorney prior to the criminal trial (DN 29, Appendix at Pages 139-140). The Kentucky Court of Appeals also noted that York presented no evidence indicating the Commonwealth was a party to the civil action or that the prosecutor in the criminal case was involved in or aware of Mrs. Bunch's deposition (DN 29, Appendix at Page 140). The Kentucky Court of Appeals concluded since Mrs. Bunch's deposition was essentially in York's hands over a year prior to his criminal trial, there was no basis for his motion for a new trial (DN 29, Appendix at Page 140).

Alternatively, the Kentucky Court of Appeals considered the totality of evidence presented during York's criminal trial and concluded that even if it characterized Mrs. Bunch's deposition testimony as newly discovered evidence it would not require a new trial (DN 29 Appendix at Page 140). It noted that the overwhelming evidence presented at trial indicated York acted alone and the victim was not struck by a hammer (DN 29, Appendix at Pages 140-141). Further, it noted in the context of addressing York's direct appeal the Supreme Court of Kentucky had opined that Mrs. Bunch's trial testimony was not devastating to the defense (DN 29, Appendix at Pages 140-141). Finally, it discounted York's newly discovered evidence argument because he was present during Bunch's beating and could have advised defense counsel if others had participated (DN 29, Appendix at Page 141).

8

The Kentucky Court of Appeals summarized its findings as follows:

"York has failed to show that he was not aware of the deposition, York has failed to present any affirmative proof that the Commonwealth knew or should have known of these statements, the overwhelming evidence presented at trial indicated York acted alone, and the rambling statements of the elderly mother of the victim one year prior to trial would not have changed the outcome of this trial....

For all the foregoing reasons, we believe York has failed in his burden to present a claim for a new trial under RCr 10.02."

(DN 29, Appendix at Page 141).

On June 16, 2000, the Kentucky Court of Appeals denied York's petition for rehearing (DN 29, Appendix at Page 150). On January 17, 2001 the Supreme Court of Kentucky issued an order denying York's motion for discretionary review (DN 29, Appendix at Page163).

Meanwhile, in May of 2000, York filed a motion to vacate, set aside, or correct judgment pursuant to Ky.R.Crim.P. 11.42 (DN 29, Appendix at Pages 164-218). In his Rule 11.42 motion York identified nine separate grounds for relief (DN 29, Appendix at Pages 164-218). In Ground 1 York set forth several claims of ineffective assistance of trial counsel (DN 29, Appendix at Pages 164-218). In an opinion and order entered July 13, 2000, the trial court denied York's request for an evidentiary hearing and his Rule 11.42 motion (DN 29, Appendix at Pages 236-244).

York timely appealed the trial court's adverse ruling. York's briefs to the Kentucky Court of Appeals made the following arguments: (1) The trial court erred and abused its discretion in denying his Rule 11.42 motion without holding an evidentiary hearing or appointing counsel; (2) he received ineffective assistance from trial counsel; (3) he received ineffective assistance from appellate counsel; and (4) the cumulative effect of errors violated his due process of law and fundamental fairness rights (DN 29, Appendix at Pages 248-275, 300-305).

The Kentucky Court of Appeals rendered an opinion on February 22, 2002 (DN 29,

9

Appendix at Pages 306-315).  It concluded that an evidentiary hearing was necessary to address York's claims that he received ineffective assistance of counsel because trial counsel (1) failed to investigate information provided by York that indicated Bunch was involved in a fight the night before he died; and (2) failed to produce an expert witness to counter the medical examiner's testimony that the victim died as a result of a blood clot caused by a blow to the head several days earlier (DN 29, Appendix at Pages 311-313).  The Kentucky Court of Appeals also reviewed the remaining claims set forth in York's Rule 11.42 motion, including his claim that trial counsel was ineffective for failing to discover the deposition of Mrs. Bunch prior to the criminal trial, and concluded they were all without merit (DN 29, Appendix at Page 313).  The Kentucky Court of Appeals vacated the order of the Russell Circuit Court and remanded the matter for further proceedings consistent with its opinion (DN 29, Appendix at Page 315).

On remand, the trial court conducted an evidentiary hearing.  York called as witnesses Danny Butler, his trial counsel; Dr. Heidingsfelder, a forensic pathologist; and himself. Mr. Butler testified that he has been practicing criminal law for approximately 30 years (DN 29, Tape 6, 9:12:06-9:12:54).  He testified that his defense strategy was to attack the causal connection between the beating and Bunch's death (DN 29, Tape 6, 09:12:54-09:13:34).  More specifically, Mr. Butler sought to demonstrate the subdural hematoma was not present when the emergency room physician examined Bunch on Sunday, February 19th (DN 29, Tape 6, 09:12:54-09:13:34). Further, he called several fact witnesses who testified they had seen Bunch out and about in the neighborhood following the emergency room visit (DN 29, Tape 6, 09:13:38-09:14:37).  Mr. Butler viewed testimony from these witnesses as going to the weight of evidence on the issue of whether York could have caused the subdural hematoma that killed Bunch (DN 29, Tape 6, 09:13:38-09:14:37).

10

Mr. Butler testified that his defense strategy relied on testimony from the emergency room physician and Dr. Biggs (DN 29, Tape 6, 09:14:45-09:15:38).  Mr. Butler recalled that testimony from the emergency room physician focused on Bunch's condition several hours after the altercation occurred (DN 29, Tape 6, 09:14:45-09:16:56).  Mr. Butler recalled that Dr. Biggs' testimony challenged the medical examiner's use of the word "acute" and indicated if the subdural hematoma was "acute" it would have shown up when the emergency room physician conducted the examination (DN 29, Tape 6, 09:15:50-09:16:56, 09:17:04-09:17:53).

Mr. Butler testified that he did not seek out a forensic pathologist to look at slides of the subdural hematoma in an attempt to establish its age (DN 29, Tape 6, 09:17:47-09:18:00).  Mr. Butler explained, based on his experience in trying a number of murder cases in rural communities he chose to rely on testimony from these two doctors because he believed their testimony would have more impact on a rural jury than a hired medical witness (DN 29, Tape 6, 09:24:40-09:33:50).

Dr. Heidingsfelder, a forensic pathologist, testified that his opinions were based on a review of materials related to the criminal trial including the autopsy report, microscopic slides of tissue blocks, diagrams of the brain made by the medical examiner, photographs taken in the emergency room on February 19th, photographs from the autopsy, crime scene photographs, photographs of the brain taken at the time of sectioning, wound locator diagrams made by the police, a police report from the initial assault, video tapes of the trial testimony, hospital records from the initial assault, and various court documents (DN 29, Tape 6, 09:36:20-09:39:30).  Dr. Heidingsfelder testified that the autopsy report indicated the cause of death was a subdural hematoma which is an accumulation of blood between the brain and the skull, beneath the dura membrane (DN 29, Tape 6, 09:40:03-09:40:54).  He explained that a subdural hematoma causes death by putting pressure on

11

the brain down towards the bottom of the skull, and the brain stem, which causes the individual to stop breathing (DN 29, Tape 6, 09:40:55-09:41:55).

In preparation for his testimony Dr. Heidingsfelder attempted to age the hematoma that killed Bunch (DN 29, Tape 6, 09:41:56-09:43:00). Dr. Heidingsfelder explained because the task of determining the age of a subdural hematoma is difficult, if not impossible, he expresses an opinion on the range of time during which the injury likely occurred (DN 29, Tape 6, 09:42:15-09:43:00). The process he uses to establish this range includes looking at the dura matter and the blood clot microscopically (DN 29, Tape 6, 09:42:49-09:43:50). Additionally, when the blood is usually 3 to 5 days old the red blood cells break down into something called hemosiderine pigment (DN 29, Tape 6, 09:43:50-09:45:39). If this pigment is present it will light up bright blue when an iron stain is added (DN 29, Tape 6, 09:43:50-09:45:39). Additionally, Dr. Heidingsfelder looks for reactive changes in the dura matter (DN 29, Tape 6, 09:43:50-09:45:39).

Dr. Heidingsfelder testified that the iron stain tests were negative and there were no reactive changes to the dura membrane (DN 29, Tape 6, 09:45:39-09:46:29). Since the iron stain tests were negative, Dr. Heidingsfelder explained it was difficult to put a precise age on the subdural hematoma in this case (DN 29, Tape 6, 09:46:25-09:47:15). He did opine that a reasonable age frame for the subdural hematoma in this case would be from 12 hours to 3 to 5 days (DN 29, Tape 6, 09:47:15-09:47:52). Thus, Bunch's death occurred somewhere between 12 hours and 3 to 5 days after the injury that caused the subdural hematoma (DN 29, Tape 6, 09:47:25-09:47:52, 09:49:55-09:50:27). Since aging a subdural hematoma is not an exact science, Dr. Heidingsfelder took exception with the level of certainty expressed by Dr. Weakley-Jones (DN 29, Tape 6, 09:50:25-09:51:20).

On cross-examination, Dr. Heidingsfelder acknowledged that the subdural hematoma

could have existed at the time of the emergency room visit (DN 29, Tape 6, 10:10:32-10:11:30). Furthermore, in response to a question by the trial court, Dr. Heidingsfelder agreed his opinion regarding the age range of the subdural hematoma (12 hours to 3 to 5 days) falls within the time interval opined by the State medical examiner (DN 29, Tape 6, 10:10:20-10:11:30).

Dr. Heidingsfelder acknowledged that symptoms from a subdural hematoma may not show up within 24 hours (DN 29, Tape 6, 09:58:56-09:59:30). However, he also testified since symptoms typically show up within hours of the injury you automatically wonder if there is a more recent injury than the one known to have occurred 2 to 3 days prior to the death (DN 29, Tape 6, 10:02:32-10:03:23). He pointed out that if the individual had been monitored and observed closely from the time of the assault to the time of death then he could say with reasonable certainty that the subdural hematoma was related to the incident (DN 29, Tape 6, 10:03:38-10:03:58).

During the evidentiary hearing York testified that his initial trial counsel successfully moved for expert funds to retain a neurologist (DN 29, Tape 6, 10:12:55). Thereafter, initial trial counsel recommended York obtain different counsel because he could not devote the amount of time necessary to defend York (DN 29, Tape 6, 10:12:55-10:14:10). After Mr. Butler took over the case, York recalls discussing with him the need to retain an expert witness and being assured that one would be called at trial (DN 29, Tape 6, 10:13:43-10:14:10).

Following the evidentiary hearing, the trial court issued an order denying York's Rule 11.42 motion (DN 29, Appendix at Pages 316-317). After considering defense counsel's testimony regarding his trial strategy, the trial testimony of the defense experts, and the hearing testimony of York's expert witness, the trial court concluded there was not a "reasonable probability" of a different result (DN 29, Appendix at Pages 316-317). In reaching this conclusion, the trial court noted the hearing testimony from York's expert was not significantly different from the trial

testimony of the medical examiner (DN 29, Appendix at 317).  Additionally, the trial court observed "there was no evidence presented regarding the source of any other injuries" (DN 29, Appendix at Page 317).

York timely appealed the adverse ruling.  His briefs to the Kentucky Court of Appeals raised only one issue.  Specifically, York argued trial counsel rendered ineffective assistance because he failed to investigate and retain an independent expert to review the cause of death (DN 29, Appendix at Pages 319-341, 359-364).

The Kentucky Court of Appeals rendered an opinion on April 22, 2005, (DN 29, Appendix at 365-372).  It concluded that trial counsel's failure to retain a forensic pathologist to rebut the medical examiner's testimony was deficient performance that prejudiced York (DN 29, Appendix at Pages 365-372).  The Kentucky Court of Appeals reversed the order denying York's Rule 11.42 motion and remanded the case to the Russell Circuit Court with directions to grant York a new trial (DN 29, Appendix at Page 372).

The Commonwealth of Kentucky filed a motion for discretionary review (DN 29, Appendix at Pages 373-387).  York filed a response to the motion (DN 29, Appendix at Pages 388-389).  After considering the arguments of the parties, the Supreme Court of Kentucky granted discretionary review (DN 29, Appendix at Page 390).

York briefed only the issue he presented to the Kentucky Court of Appeals (DN 29, Appendix at Pages 411-437).  On February 22, 2007, the Supreme Court of Kentucky rendered an opinion reversing the Court of Appeals and affirming the order of the Russell Circuit Court (DN 29, Appendix at Page 438).  The Supreme Court of Kentucky concluded York had not demonstrated deficient performance because trial counsel's decision not to utilize an outside forensics expert, who's testimony likely would have contradicted his two most favorable expert witnesses, was

14

reasonable trial strategy (DN 29, Appendix at Pages 444-445).  Additionally, after considering the hearing testimony of York's expert, the trial testimony of the medical examiner, and the trial testimony of the two doctors called by defense counsel, the Supreme Court of Kentucky concluded the failure to call a forensics pathologist was not prejudicial (DN 29, Appendix at Pages 443-444).

## CONCLUSIONS OF LAW

### A

Since York filed his petition for writ of habeas corpus on August 20, 2007 (DN 1) review of the State court decisions is governed by Chapter 153 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (1996) ("AEDPA").  Lindh v. Murphy, 521 U.S. 320, 336 (1997).  As to each claim made by York, the Court must determine first whether a Constitutional right has been violated.  Williams v. Taylor, 529 U.S. 362, 367 (2000).  If the answer is in the affirmative and the State court adjudicated the claim on its merits, this Court must then employ the standard of review set forth in 28 U.S.C. § 2254(d) to determine whether to grant the petition.  Williams, 529 U.S. at 367, 402-403, 412-413.  As amended, by Chapter 153 of AEDPA, § 2254(d) provides as follows:

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) Resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding."

Under the "contrary to" clause of § 2254(d)(1), the Court may grant the petition if

"the state court arrives at a conclusion opposite to that reached by ... [the Supreme Court] ... on a question of law or if the state court decides a case differently than ...[the Supreme Court] ... has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-413.   Under the "unreasonable application" clause of § 2254(d)(1), the Court may grant the petition if  "the state court identifies the correct governing principle from ... [the Supreme Court's] ... decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  To meet this standard the State court's application of clearly established federal law must be more than incorrect, it must be objectively unreasonable. Id. at 409-411.  To meet the "unreasonable determination of facts" standard in § 2254(d)(2) the undersigned opines the State court's determination of facts must be more than incorrect, it must be objectively unreasonable. Id.  In sum, § 2254(d), as amended by Chapter 153 of AEDPA, places constraints on the power of the Court to grant a petition as to constitutional claims adjudicated on the merits in the State courts. Williams, 529 U.S. at 412.


B

In Ground 1 York argues that his Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution were violated when the trial court denied his motion for a directed verdict (DN 1, Memorandum at Pages 6-7).  He contends the evidence was insufficient to establish that his acts caused Bunch's death (DN 1, Memorandum at Pages 6-7).

A State prisoner must first "fairly present" his Constitutional claim to the State courts, to provide them with an opportunity to remedy the alleged Constitutional infirmity, before federal habeas corpus review is available. Baldwin v. Reese, 541 U.S. 27, 29 (2004); Castille v. Peoples, 489 U.S. 346 (1989).  A federal rights claim is "fairly presented" to each State court if the petitioner's motion, petition, memorandum or brief cites in conjunction with the claim (1) the federal

source of law upon which he relies; (2) federal or State cases deciding such a claim on federal grounds; or (3) by simply labeling the claim "federal." <u>Baldwin</u>, 541 U.S. at 32.

On direct appeal, York argued the trial court erred in denying his motion for directed verdict because the evidence was insufficient to establish that his acts were the cause of death (DN 29, Appendix at Pages 13-19). York did not cite the federal source of law upon which he now relies; a federal or State case deciding his claim on federal grounds; or label his claim "federal" (DN 29, Appendix at Pages 13-19). In sum, York did not "fairly present" his federal Constitutional claim to the Supreme Court of Kentucky on direct appeal (DN 29, Appendix at Pages 13-19). Instead, he presented a purely State law claim (DN 29, Appendix at Pages 13-19).

Since York failed to "fairly present" his federal Constitutional claim on direct appeal in the State courts, he is now procedurally barred from doing so. <u>Bronston v. Commonwealth</u>, 481 S.W.2d 666, 667 (Ky. 1972). Thus, federal review of the claim in Ground 1 is barred absent a showing of "cause" and "prejudice." <u>Reed v. Farley</u>, 512 U.S. 339, 353-355 (1994); <u>Teague v. Lane</u>, 489 U.S. 288, 297-299 (1989); <u>Murray v. Carrier</u>, 477 U.S. 478, 495-496 (1986). To establish "cause" York must demonstrate that something external to him impeded his efforts to comply with the State's procedural rules. <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991). To show "prejudice," York must show that he was actually prejudiced as a result of the claimed Constitutional error. <u>United States v. Frady</u>, 456 U.S. 152, 170-171 (1982). Notably, the prejudice must have worked to York's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>Id.</u> at 170. If there is strong evidence of York's guilt and a lack of evidence for his claim, the actual prejudice requirement is not satisfied. <u>Id.</u> at 170-172. Notably, York has not made a showing of "cause" and "prejudice". Therefore, the undersigned concludes federal review of the claim set forth in Ground 1 of the petition is barred.

A two-prong test is used to determine whether a Certificate of Appealability should issue on a habeas claim denied on a procedural ground. <u>Slack v. McDaniel</u>, 529 U.S. 473, 484-485 (2000). To satisfy the first prong York must demonstrate "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a Constitutional right." <u>Id.</u> at 484. To satisfy the second prong, he must show "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u> Notably, the Court need not conduct this two-prong inquiry in the order identified or even address both parts if York makes an insufficient showing on one part. <u>Id.</u> at 485.

Here, for the reasons set forth above, the undersigned concludes that a plain procedural bar is present and jurists of reason would not find it debatable whether federal review is barred. <u>Id.</u> at 484. Therefore, the undersigned does not recommend issuance of a Certificate of Appealability as to the claim asserted in Ground 1.

## C

In Ground 2 York argues his rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated when the trial court denied his motion to suppress statements he made to Detective Wheat and Sheriff Bennett (DN 1, Memorandum at Page 7). York refers the Court to his <u>Miranda</u>[3] warning argument on direct appeal (DN 1, Memorandum at Page 7).

If an individual is in custody appropriate warnings must be given by law enforcement officials before beginning interrogation in order to protect the individual's Fifth Amendment privilege against self-incrimination. <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-479 (1966). The

---

[3]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

objective test, for determining if an individual is in custody, is whether a reasonable person in the individual's position, knowing the facts as the individual knew them, would have felt that he was under arrest or was "otherwise deprived of his freedom of action in any significant way." Id. at 477. The test does not turn on the subjective views of the person being questioned or the interrogating officer. Stansbury v. California, 511 U.S. 318, 323 (1994) (citation omitted).

Notably, Miranda warnings are not triggered by the mere placement of an individual into an officer's custody, rather the warnings must be given before any "interrogation" begins. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Interrogation is defined as "questioning initiated by law enforcement officials." Miranda, 384 U.S. at 444. This definition has been extended to the "functional equivalent" of express questioning and includes, "any words or actions on the part of police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301. Thus, a custodial interrogation includes "words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have ... the force of a question on the accused' ... and therefore be reasonably likely to elicit an incriminating response." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (citation omitted).

The State court record indicates on February 22, 2005, Detective Wheat and Sheriff Bennett went to York's house and asked if they could speak with him (DN 29, Appendix at Page 60). York agreed and let them into his own home (DN 29, Appendix at Page 60). York was forty-four years old at the time, he was not restrained or placed under arrest, and nothing prevented him from asking the officers to leave his home or from refusing to answer their questions (DN 29, Appendix at Pages 60-61). During his conversation with the officers, York indicated on the night in question Bunch fell off his porch (DN 29, Appendix at Page 57). Additionally, York denied ever

19

having been to Bunch's trailer (DN 29, Appendix at Page 57).

Clearly, the relevant facts indicate York was not in custody at the time he spoke with Detective Wheat and Sheriff Bennett.  Moreover, on direct appeal York conceded this point.

On direct appeal, York attempted to end run the "in custody" requirement by asserting he was the focus of the murder investigation when the questioning occurred on February 22, 2005.  He contended that Detective Wheat had by then observed signs of an altercation in the victim's trailer and had been told by the victim's parents that York assaulted their son in the early morning hours of February 19th (DN 29, Appendix at Pages 20-21).  York argued since he was the focus of the murder investigation the questioning by the law enforcement officers constituted a custodial interrogation and he was entitled to Miranda warnings (DN 29, Appendix at Pages 19-23, 59-60).  York argued in light of the abundant evidence at trial showing he assaulted Bunch, his statements to the officers had a profoundly prejudicial impact on the jury (DN 29, Appendix at Page 22).

In essence, York contended being the focus of a murder investigation is the functional equivalent of being in custody.  York's argument is contra to established Supreme Court precedent that holds being the focus of a criminal investigation is not the functional, and, therefore, legal, equivalent of a custodial interrogation that requires Miranda warnings.  Beckwith v. United States, 425 U.S. 341, 346-347 (1976).  It is the compulsive aspect of the custodial interrogation, not the strength or the content of law enforcement's suspicions at the time the questioning is conducted, that led the Supreme Court to impose the Miranda requirements with regard to custodial questioning.  Id. at 346-347.  Moreover, the Supreme Court's holding in Miranda "implicitly defined 'focus,' for its purposes, as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Id. at 347 (quoting

20

<u>Miranda</u>, 348 U.S. at 444) (emphasis supplied).

Since York has failed to demonstrate a Constitutional violation, it is not necessary to perform a § 2254(d) review.  Notwithstanding, the Supreme Court of Kentucky relied on the holding in <u>Beckwith</u> to conclude there was no merit to York's <u>Miranda</u> claim (DN 29, Appendix at Pages 59-60).  Clearly, its decision is not contrary to nor does it involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-413 (2000).  In sum, York is not entitled to a writ on this claim.

For the reasons set forth above, the undersigned is confident that jurists of reason would not find it debatable whether Ground 2 states a valid claim of the denial of a Constitutional right.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Thus, the undersigned does not recommend issuance of a Certificate of Appealability as to the claim asserted in Ground 2.


D

In Ground 3 York argues that he was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court failed to grant a mistrial following highly prejudicial and inflammatory statements by the victim's mother who testified for the Commonwealth (DN 1, Memorandum at Pages 7-8).

On direct appeal, York argued the trial court erred in not granting a mistrial following repeated unresponsive, highly inflammatory, and prejudicial statements by the victim's mother while testifying for the Commonwealth (DN 29, Appendix at Pages 23-27).  York did not cite the federal source of law upon which he now relies; a federal or State case deciding his claim on federal grounds; or label his claim "federal" (DN 29, Appendix at Pages 23-27).  In sum, York did not

"fairly present" his federal Constitutional claim to the Supreme Court of Kentucky on direct appeal (DN 29, Appendix at Pages 23-27).   Instead, he presented a purely State law claim (DN 29, Appendix at Pages 23-27).

Since York did not "fairly present" his federal Constitutional claim on direct appeal in the State courts, he is now procedurally barred from doing so.  Bronston v. Commonwealth, 481 S.W.2d 666, 667 (Ky. 1972).  Thus, federal review of the claim in Ground 3 is barred absent a showing of "cause" and "prejudice."  Reed v. Farley, 512 U.S. 339, 353-355 (1994); Teague v. Lane, 489 U.S. 288, 297-299 (1989);  Murray v. Carrier, 477 U.S. 478, 495-496 (1986).  To establish "cause" York must demonstrate that something external to him impeded his efforts to comply with the State's procedural rules.  Coleman v. Thompson, 501 U.S. 722 (1991).  For example, ineffective assistance of counsel that satisfies both components of the test in Strickland v. Washington, 466 U.S. 668, 687 (1984), will establish "cause."  Murray, 477 U.S. at 489.  To show "prejudice," York must show that he was actually prejudiced as a result of the claimed Constitutional error by the trial court. United States v. Frady, 456 U.S. 152, 170-171 (1982).

Notably, York has not attempted to make a showing of "cause" by asserting appellate counsel is responsible for this procedural default (DN 1).  Notwithstanding, the undersigned will consider whether the failure to present this federal Constitutional claim on direct appeal satisfies both components of the Strickland test.

Normally, an allegation of ineffective assistance of counsel must itself be fully exhausted in the State courts before it can be used in this court to establish "cause" for a procedural default in the State courts.  Edwards v. Carpenter, 529 U.S. 446, 452-453 (2000) (When a petitioner claims ineffective assistance of counsel as cause for the procedural default of a substantive Constitutional claim in the State court, the allegation of ineffectiveness of counsel is a separate claim

22

that must itself be exhausted in the State courts); <u>Murray</u>, 477 U.S. at 489 ("[T]he exhaustion doctrine ... generally requires that a claim of ineffective assistance of counsel be presented to State courts before it may be used to establish cause for a procedural default.").   However, under Kentucky law York has no method to present a claim of ineffective assistance of appellate counsel because his direct appeal was completely processed and the judgment affirmed.   <u>Hicks v. Commonwealth</u>, 825 S.W.2d 280, 281 (Ky. 1992).  Since there is an absence of an available State corrective process it is appropriate for this Court to address a first time claim that appellate counsel rendered ineffective assistance.  28 U.S.C. § 2254(b)(1)(B)(I).

      With regard to claims of ineffective assistance of counsel, the Supreme Court has commented as follows:

> "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or ... sentence resulted from a breakdown in the adversary process that renders the result unreliable."

<u>Strickland</u>, 466 U.S. at 687.  To satisfy the performance component a defendant must show that counsel's representation fell below an objective standard of reasonableness.  <u>Id.</u> at 688.

      Notably, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  <u>Id.</u> at 691 (citation omitted).  "The purpose of the Sixth Amendment guarantee of counsel is to insure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding."  <u>Id.</u> at 691-692.  For this reason, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  <u>Id.</u> at 692.

Therefore, the prejudice component requires the defendant show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

The Court need not conduct this two-component inquiry in the order identified above or even address both parts of the test if a defendant makes an insufficient showing on one. Id. at 697. For example, if the Court determines that a defendant has failed to satisfy the prejudice prong then it need not determine whether counsel's performance was deficient. Id. Further, the two-component test articulated in Strickland applies to claims of ineffective assistance of appellate counsel. Smith v. Murray, 477 U.S. 527, 535 (1986); Bell v. Lockhart, 795 F.2d 655, 657 (8th Cir. 1986).

Notably, the Supreme Court has previously indicated "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 486-487 (1986); Engle v. Isaac, 456 U.S. 107, 133-134 (1982). Nor can it seriously be maintained that the decision to present a State law claim, rather than a federal Constitutional claim, was an error of such magnitude that it rendered counsel's performance Constitutionally deficient. Strickland, 466 U.S. at 687, 690. The process of discarding weaker arguments on appeal and focusing on those more likely to prevail is a hallmark of effective appellate advocacy. Smith, 477 U.S. at 536. For example, presenting a specious Constitutional claim merely dilutes the credibility of what might be a stronger State law claim as well as the overall credibility of the direct appeal brief. Furthermore, as a tactical matter, appellate counsel must consider the differing burdens of the State law claim and a federal Constitutional claim. For example, the State law claim involved showing an abuse of

discretion.  Whereas a federal due process claim would require showing an abuse of discretion that rose to the level of depriving York of a fundamentally fair trial.  <u>Montana v. Egelhoff</u>, 518 U.S. 37, 53 (1996).

In light of all the circumstances, appellate counsel's failure to present a federal Constitutional claim does not fall outside the wide range of professional competent assistance.  <u>Strickland</u>, 466 U.S. at 690.  Moreover, York cannot demonstrate there is a "reasonable probability" that, but for appellate counsel's omission, the result of his appeal would have been different.  <u>Id.</u> at 694.  Thus, York cannot use a claim of ineffective assistance of counsel to establish "cause" for the procedural default before the Supreme Court of Kentucky on direct appeal.  For this reason, federal review of the claim in Ground 3 is barred.

Since a plain procedural bar is present as to the claim set forth in Ground 3, jurists of reason would not find it debatable whether this claim is procedurally defaulted and that York cannot show "cause" and "prejudice" to excuse his procedural default.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484-485 (2000).  Therefore, the undersigned does not recommend issuance of a Certificate of Appealability as to the claim asserted in Ground 3.

E

In Ground 4 York argues his Fifth, Sixth and Fourteenth Amendment rights under the United States Constitution were violated because the Commonwealth suppressed: (1) Mrs. Bunch's deposition; and (2) statements from the victim's father and brother (DN 1, Memorandum at Pages 11-14).  According to York, the deposition and statements indicate on the night of the assault the victim reported that Lori Morgan and Donna Akers beat him in the head with a hammer (DN 1, Memorandum at Pages 11-14).  Essentially, York is challenging the State court's

25

adjudication of his  motion for a new trial based on newly discovered evidence and his related claim of a <u>Brady</u>[4] violation.

Notably, York's <u>Brady</u> claim to the Kentucky Court of Appeals did not mention statements from the victim's father and brother (<u>compare</u> DN 1, Memorandum at Pages 11-14 with DN 29, Appendix Memorandum at Pages 87-98, 120-124).  Further, he is now procedurally barred from doing so.  Since York's procedural default provides an adequate and independent grounds for the State's denial of relief and York has failed to show "cause" and "prejudice" to excuse his procedural default, federal review of this portion of his <u>Brady</u> claim is barred.  <u>Reed v. Farley</u>, 512 U.S. 339, 353-355 (1994); <u>Teague v. Lane</u>, 489 U.S. 288, 297-299 (1989).

The undersigned will now address the <u>Brady</u> claim that York presented to the Kentucky Court of Appeals.  Notably, the State appellate court disposed of this claim on a State law basis.  For this reason, York's <u>Brady</u> claim is examined *de novo* instead of performing a § 2254(d) review.  <u>Rompilla v. Beard</u>, 545 U.S. 374, 390 (2005).

Under <u>Brady v. Maryland</u>, the prosecution is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.  373 U.S. 83, 87 (1963).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 57 (1987).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>

The Court applies a three-part test to determine whether a <u>Brady</u> violation has occurred.  <u>Strickler v. Greene</u>, 527 U.S. 263, 288-282 (1999).  Specifically, the petitioner must demonstrate: (1) the evidence was favorable to the defense, either because it is exculpatory or

---

[4]<u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

impeaching; (2) the evidence was suppressed (whether intentionally or not) by the Government; and (3) prejudice to the defense occurred.  Id.  Notably, if the Court concludes despite the suppressed material the jury would still have convicted the petitioner based on the evidence presented at trial, then the conviction must stand.  Id. at 296.  Moreover, no Brady violation occurs when a petitioner knew or should have known of the essential facts permitting him to take advantage of the information, or where the evidence was available to the defendant from another source.  Spirko v. Mitchell, 368 F.3d 603, 611 (6th Cir. 2004); United States v. Delgado, 350 F.3d 520, 527 (6th Cir. 2003).

York is asserting the evidence is favorable to the defense because Mrs. Bunch's deposition could have been used to impeach her trial testimony.  Assuming this to be true, York cannot satisfy the other two parts of the three-part test.  He has not demonstrated that the evidence was suppressed by the Commonwealth.  Nor can he because Mrs. Bunch's deposition was taken in a civil action York filed.  Further, York's attorney in that civil action actively participated in the deposition.  Moreover, York has not demonstrated that the Commonwealth knew of or possessed a copy of Mrs. Bunch's deposition.  In sum, York has no basis for claiming that the Commonwealth suppressed this evidence.  Nor can he demonstrate prejudice to the defense occurred.  If the trial testimony of Mrs. Bunch is excised from the State court record there is still overwhelming testamentary evidence showing York beat Bunch in the early morning hours of February 19th.

Alternatively, the undersigned concludes that no Brady violation occurred because York knew or should have known of the essential facts permitting him to take advantage of the information.  Spirko, 368 F.3d at 611; Delgado, 350 F.3d at 527.  His attorney in the civil action actively participated in taking Mrs. Bunch's deposition.  For the same reason, this evidence was available to York from a source other than the Commonwealth.  Spirko, 368 F.3d at 611; Delgado,

350 F.3d at 527.  Thus no <u>Brady</u> violation occurred.

York's motion for a new trial was premised on his contention that Mrs. Bunch's deposition testimony was newly discovered evidence.  Clearly, he is challenging a perceived error of State law which is not cognizable in federal habeas corpus proceedings unless the error deprives him of a fundamentally fair trial.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  For the reasons set forth above, Mrs. Bunch's deposition is not newly discovered evidence.  Since there is no factual support for his claim, York cannot demonstrate there was an error of State law that deprived him of a fundamentally fair trial.

For the reasons set forth above, the undersigned is confident that jurors of reason would not find it debatable whether York's <u>Brady</u> claim, based upon Mrs. Bunch's deposition, fails to state a valid claim of the denial of a Constitutional right.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Moreover, the undersigned is confident that jurists of reason would not find it debatable whether a plain procedural bar is present as to York's <u>Brady</u> claim, based on statements by the victim's father and brother, and York's motion for a new trial claim.  <u>Id.</u>  Thus, the undersigned does not recommend issuance of a Certificate of Appealability as to the claims asserted in Ground 4.

F

A substantial portion of York's petition is devoted to his ineffective assistance of counsel claim in Ground 5 (DN 1, Memorandum at Pages 17-47).  He argues that trial counsel rendered ineffective assistance because counsel did not hire a forensic pathologist, such as Dr. Heidingsfelder, to contradict the expert testimony offered by the medical examiner, Dr.

Weakley-Jones[5] (DN 1, Memorandum at Pages 17-47).  Additionally, York challenges adjudication

of his claim by the Supreme Court of Kentucky (DN 1, Memorandum at Pages 17-47).

As previously mentioned, there are two components to a claim that counsel's

assistance was so defective as to require reversal of a conviction or sentence.  Strickland v.

Washington, 466 U.S. 668, 687 (1984).  To satisfy the performance component a defendant must

show that trial counsel's representation fell below an objective standard of reasonableness.  Id. at

688.  Notably, judicial scrutiny of counsel's performance must be highly deferential.  Id. at 689.  To

fairly assess counsel's performance, the Court must make every effort "to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time."  Id.   Moreover, because of the

difficulties inherent in making such an evaluation the Court must indulge a strong presumption that

---

[5]In Ground 5 York asserts there are additional omissions that amount to ineffective assistance of counsel (DN 1, Memorandum at Pages 17-47).  For example, trial counsel failed to challenge Dr. Weakley-Jones' "tainted" expert testimony in a Daubert hearing and counsel failed to adequately prepare for trial (DN 1, Memorandum at Pages 17-47).  However, York did not present these additional omissions to the Kentucky Court of Appeals (DN 29, Appendix at Pages 319-341, 359-364) or to the Supreme Court of Kentucky (DN 29, Appendix at Pages 410-437) and he is now procedurally barred from doing so.  Gross v. Commonwealth, 648 S.W.2d 853, 857 (Ky. 1983).

Notably, York cannot assert ineffective assistance of counsel in a collateral post-conviction proceeding to show "cause" for this procedural default.  28 U.S.C. § 2254(i).  Since York's procedural default provides an adequate and independent grounds for the State's denial of relief and York has failed to show "cause" and "prejudice" to excuse his procedural default, federal review of these additional claims of ineffective assistance of counsel are barred.  Reed v. Farley, 512 U.S. 339, 353-355 (1994); Teague v. Lane, 489 U.S. 288, 297-299 (1989).

Further, since a plain procedural bar is present, jurists of reason would not find it debatable whether these additional claims of ineffective assistance of counsel are procedurally defaulted and York cannot show "cause" and "prejudice" to excuse his procedural default.  Slack v. McDaniel, 529 U.S. 473, 484-485 (2000).  Therefore, the undersigned does not recommend issuance of a Certificate of Appealability as to claims of ineffective assistance of counsel in Ground 5 that York failed to present to the State appellate courts in his post-evidentiary hearing appeal.

counsel's conduct falls within the wide range of reasonable professional assistance.  Id.  This means that a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689 (citation omitted).

The second component requires a defendant show that counsel's deficient performance prejudiced the defense.  Id. at 687, 691-692.  For this reason a defendant bears the burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

During the criminal trial the prosecutor presented overwhelming evidence that York beat Bunch in the early morning hours of February 19, 1995.  Expert opinion testimony from the assistant chief medical examiner, Dr. Weakley-Jones, established that the cause of death was a subdural hematoma in Bunch's brain; the subdural hematoma was from 2 to 3 days old; and it had been caused by blunt force trauma to Bunch's head.  Thus, her opinion testimony causally connected Bunch's death on the morning of February 22nd to the beating meted out by York in the early morning hours of February 19th.  Further, Dr. Weakley-Jones provided an expert opinion that explained why the emergency room physician who examined Bunch on February 19th did not detect the subdural hematoma.  Notably, Dr. Weakley-Jones classified the subdural hematoma as "acute" because it was less than 5 days old.

The prosecution presented the emergency room physician, Dr. Tolentino, as a witness in its case in chief.  During cross-examination, defense counsel elicited an expert opinion from Dr. Tolentino that was favorable to York.  Specifically, he opined if Bunch had sustained an "acute" subdural hematoma in the early morning hours of February 19th there would have been definite signs or symptoms when he examined Bunch, 8 to 9 hours later.  Dr. Tolentino's expert opinion was

premised on his belief that an "acute" subdural hematoma will manifest symptoms within 24 hours of the triggering event.

During York's case in chief, defense counsel called Dr. Roy Biggs, a radiologist at the hospital where Bunch treated on February 19th. Although defense counsel did not seek to qualify Dr. Biggs as an expert witness on subdural hematomas, he nonetheless elicited key expert opinions favorable to York. First, Dr. Biggs testified that the x-ray of Bunch's skull, taken on February 19th, is used to detect broken bones not soft tissue injuries such as a subdural hematoma. He also testified that the term "acute" means the condition develops within 24 hours of the triggering event or incident. Thus, explained Dr. Biggs, an "acute" subdural hematoma must develop within 24 hours of the triggering injury. Further, Dr. Biggs opined that if the emergency room physician had seen signs or indications of a subdural hematoma he probably would have ordered a CT scan of Bunch's skull because that is the appropriate diagnostic tool.

While there are some differences between the expert opinions expressed by Dr. Weakley-Jones and Dr. Heidingsfelder, their ultimate conclusions regarding the age range of the subdural hematoma do not differ significantly. Specifically, Dr. Weakley-Jones opined it was between 2 and 3 days old and Dr. Heidingsfelder opined it was from 12 hours to 3 to 5 days old. Notably, there is an absence of evidence demonstrating Bunch sustained a head injury after he visited the emergency room.[6] Thus, testimony from either forensic pathologist would have provided a causal connection between the beating by York and Bunch's death 3 days later. Moreover, these age opinions from both forensic pathologists tend to contradict favorable expert testimony from Drs. Tolentino and Biggs regarding the likelihood that Bunch had a subdural hematoma when he visited

---

[6]While York presented testimony indicating Bunch was out and about following the emergency room visit, he did not present any evidence showing Bunch sustained a head injury thereafter.

the emergency room on February 19th.  For these reasons, the undersigned concludes that York has

failed to demonstrate there is a reasonable probability that, but for trial counsel's failure to call a

forensic pathologist such as Dr. Heidingsfelder, the result of the trial would have been different.

Strickland, 466 U.S. at 694.

Equally important, trial counsel's testimony during the evidentiary hearing shows his

decision not to call a forensics pathologist, such as Dr. Heidingsfelder, was part of his trial strategy.

Defense counsel presented expert opinions from doctors he believed a rural jury was more likely to

believe on the key issue of whether the injuries York inflicted caused Bunch's death.  For this

reason, York has not overcome the presumption that, under the circumstances, defense counsel's

action was sound trial strategy.  Id. at 689.

Since York has failed to demonstrate a Constitutional violation, it is not necessary

to perform a § 2254(d) review.  Notwithstanding, the Supreme Court of Kentucky relied on the

holding in Strickland to conclude there was no merit to his claim of ineffective assistance of counsel

(DN 29, Appendix at Pages 442-445).[7]  Clearly, adjudication of this claim by the Kentucky Supreme

---

[7]Addressing the prejudice component first, the Supreme Court of Kentucky reached the
following conclusion:

> "As found by the trial court, Dr. Heidingsfelder's ultimate
> conclusions did not differ significantly from the testimony offered
> by Dr. Weakley-Jones.  Although he disagreed with Dr.
> Weakley-Jones as to her certainty regarding the age of the subdural
> hematoma located in the victim's brain, he nonetheless concluded
> that the injury causing the hematoma could have been inflicted
> anywhere between 12 hours and 5 days prior to the victim's death.
> Even more notable was the fact that Dr. Heidingsfelder's
> testimony contradicted the extremely favorable testimony of Dr.
> Tolentino (and to some extent, by Dr. Biggs) that if the victim
> indeed had a subdural hematoma at the time he visited the hospital,
> he either would have been dead within 24 hours or they would
> have, at least, noticed signs or symptoms of its presence.
> Accordingly, we agree with the trial court that the trial attorney's
> failure to call an expert such as Heidingsfelder was not

32

Court has not resulted in a decision that is either "contrary to" or involves an "unreasonable application of," the rule set forth in <u>Strickland</u>.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-413 (2000) (quoting § 2254(d)(1)).   Nor has the Supreme Court of Kentucky made an unreasonable determination of the facts in light of the evidence presented during the State court proceedings.  28 U.S.C. § 2254(d)(2).  In sum, York is not entitled to a writ on this claim of ineffective assistance of counsel.

The Kentucky Court of Appeals and the Supreme Court of Kentucky considered the same evidence and reached differing conclusions regarding the merits of York's ineffective assistance of counsel claim.  For this reason, the undersigned concludes that jurists of reason would find it debatable whether Ground 5 states a valid claim of the denial of a Constitutional right.  <u>Slack</u>

---

prejudicial."

(DN 29, Appendix at Pages 443-444).  Addressing the performance component, the Supreme Court of Kentucky concluded as follows:

> "Appellee's chief complaint was that Dr. Tolentino and Dr. Biggs were not qualified as forensics experts by the defense.  However, it is not necessary 'in all cases [for] an attorney [to] hire a rebuttal expert witness in order to avoid being deemed ineffective.' ... in this case, additional expert testimony was not critical given the fact that both local doctors testified substantially in favor of the defense's theory of the case. ... the trial attorney's decision not to utilize an outside forensics expert that likely would have contradicted his two most favorable witnesses was reasonable trial strategy; and it is neither fair nor proper for us to question this decision upon hindsight. ...
>
> Criminal defense attorneys are no more deemed to have deviated from the appropriate standard of care due to a bad result than our medical providers.  Counsel in this case put on a good defense for appellee; the jury just didn't accept it."

(DN 29, Appendix at Page 444-445).

v. McDaniel, 529 U.S. 473, 484 (2000).   Thus, the undersigned recommends issuance of a

Certificate of Appealability as to this claim of ineffective assistance of counsel in Ground 5.


G

In Ground 6 York argues he received ineffective assistance of counsel in conjunction

with the Rule 11.42 proceedings before the trial court (DN 1, Memorandum at Pages 48-52).   More

specifically, he argues on remand from the Kentucky Court of Appeals his appointed counsel

abandoned many of the claims asserted in the Rule 11.42 motion (DN 1, Memorandum at Pages

48-52).   Additionally, York accuses his court-appointed counsel of failing to object to an alleged

change to the transcript regarding the medical examiner's testimony (DN 1, Memorandum at Pages

49-50).

A petition for writ of habeas corpus is not used to challenge errors or deficiencies in

State post-conviction proceedings because such claims are collateral to whether York "is in custody

in violation of the Constitution or the laws or treaties of the United States."   28 U.S.C. § 2254(a);

Kirby v. Dutton, 794 F.2d 245, 246-248 (6th Cir. 1986).   In sum, the claim in Ground 6 is not

cognizable in federal habeas corpus proceedings.   Kirby, 794 F.2d at 246-248.

Additionally, claims of ineffective assistance of counsel during State collateral

post-conviction proceedings are not cognizable in federal habeas corpus proceedings.   28 U.S.C. §

2254(I).   Thus, federal review is not available for York's claims of ineffective assistance of counsel

set forth in Ground 6.

For the reasons set forth above, the undersigned is confident that jurists of reason

would not find it debatable whether the claims in Ground 6 are cognizable in federal habeas corpus

proceedings.   Slack v. McDaniel, 529 U.S. 473, 484-485 (2000).   Thus, the undersigned does not

recommend issuance of a Certificate of Appealability as to the claims asserted in Ground 6.

H

In Ground 7 York argues that he was denied his rights to life, liberty and the pursuit of happiness under the Fourteenth Amendment to the United States Constitution because the record depicts his prosecution and conviction is the product of an abundance of false medical evidence (DN 1, Memorandum at Pages 53-62). Essentially, York is arguing actual innocence based on his interpretation of the evidence (DN 1, Memorandum at Pages 53-62).

York is simply not entitled to habeas relief based on his subjective claim of "actual innocence." Moreover, Supreme Court habeas jurisprudence "makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner may pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993). Clearly, York is not seeking to excuse a procedural error so that he may bring an independent Constitutional claim challenging his conviction or sentence. Rather, he is arguing that he is entitled to habeas relief simply because he believes that his conviction is factually incorrect, notwithstanding the jury's determination otherwise. Since the United States Supreme Court has never held that habeas corpus extends to free-standing claims of "actual innocence," the undersigned concludes the claim in Ground 7 is not cognizable in federal habeas corpus proceedings. Herrera, 506 U.S. at 404-405.

For the reasons set forth above, the undersigned is confident that jurists of reason would not find it debatable whether the claim of "actual innocence" asserted in Ground 7 is cognizable in federal habeas corpus proceedings. Slack v. McDaniel, 529 U.S. 473, 484-485 (2000). Thus, the undersigned does not recommend issuance of a Certificate of Appealability as to the claim

of "actual innocence" asserted in Ground 7.


## RECOMMENDATION

For the foregoing reasons, it is recommended that York's petition for writ of habeas corpus be DENIED and that a Certificate of Appealability be DENIED as to the claims asserted in Grounds 1, 2, 3, 4, 6 and 7 in his petition.   The undersigned recommends that a Certificate of Appealability be GRANTED as to his claim in Ground 5 that trial counsel rendered ineffective assistance because counsel failed to hire a forensic pathologist.   The undersigned recommends that a Certificate of Appealability be DENIED as to the additional claims of ineffective assistance of counsel in Ground 5 that York failed to present to the State appellate courts in his post-evidentiary hearing appeal.


## NOTICE

Therefore, under the provisions of 28 U.S.C. Sections 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.   Within ten (10) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.   If a party has objections, such objections must be filed

within ten (10) days or further appeal is waived.  <u>Thomas v. Arn</u>, 728 F.2d 813 (6th Cir.), <u>aff'd</u>, U.S.

140 (1984).

Copies:      Petitioner, *pro se*
             Counsel of Record